UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MARTIN RHYS JONES
a/k/a Martin Reece
a/k/a John Allen,

                              Defendant.

**DECISION AND ORDER**

12-CR-125W

## I.   INTRODUCTION

Pending before the Court is a motion (Dkt. No. 337) by defendant Martin Rhys Jones ("Jones") for pretrial release on a $250,000 bond secured by up to $100,000 cash.  Alternatively, Jones asks for severance from his codefendants and an immediate trial.  Jones has been in continuous custody since March 4, 2013.  After consenting to initial requests by his codefendants for extensions of time to file pretrial motions, Jones decided this year that he does not want to file any pretrial motions himself.  Jones has declared twice in court that he is ready for trial.  Pretrial release has become necessary, according to Jones, because the overall case is approaching four years of age with no sign that codefendants will file motions anytime soon.  Especially given a limited criminal history, Jones wants to avoid what could wind up being as long as five years in pretrial custody before going to trial, if he remains joined with his codefendants.

The Government opposes the motion because it considers Jones a significant flight risk.  Jones faces significant charges here and evaded British prosecution on similar charges in the past.  Jones also demonstrated an unwillingness to face the charges in this case when he spent about a year fighting extradition from Spain.  The Government also opposes Jones's alternative request for severance.  According to the Government, Jones was one of two architects of the fraudulent investment operation alleged in the indictment and should face trial together with the operatives whom he directed.  The United States Probation Office ("USPO") recommends continued detention, given Jones's lack of status in this country and his history with British authorities.

The Court held a bail review hearing on July 16, 2015.  For the reasons below, the Court denies Jones's motion but without prejudice to renew after March 1, 2016.

## II.   BACKGROUND

### A. Main Allegations in the Indictment

This case concerns allegations that Jones helped orchestrate an intercontinental investment scam that brought all of the defendants an aggregate illicit profit of about $5 million.  While the scam operated, Jones, a citizen of the United Kingdom, resided in Barcelona, Spain.  The essence of the scam was that Jones and others allegedly sold restricted stock over-the-counter as freely traded shares, without telling investors about the stock restrictions.  The following

2

excerpt from the indictment, filed on April 17, 2012, summarizes the core

operation of the scam:

> Small, privately held United States corporate entities could issue shares of stock, including freely traded shares which were considered "over-the-counter" trades, and which were reported on the "over-the-counter" bulletin board ("OTCBB") or "pink sheets." The OTCBB and pink sheets were quotation mediums that contained quotations for thousands of over-the-counter stocks not listed on any of the major stock markets. Shares which had values considerably less than a dollar per share were sometimes referred to as "penny stock."

> Small, privately held corporate entities could also issue restricted shares, which could not be freely traded, including so-called "Reg S" shares, that is, sales of shares restricted to purchasers outside of the United States.  The sales of restricted shares were not reported on the "over the counter" bulletin board or "pink sheets."  Restricted shares had a value far less than that of freely traded shares.

> JONES and WROBEL ran a telemarketing operation, sometimes referred to as a "boiler room," from a number of locations in Barcelona, Spain.  In this operation, callers contacted prospective investors by telephone to sell "over the counter" or "pink sheet" stocks, using high pressure sales tactics and fraudulent statements and representations.  The boiler room used a variety of names, beginning with Newbridge International, then Brecon Global, then Strategic Energy Partners, and then Hammerson Equity Group.

> The boiler room obtained shares of restricted stock issued by various companies, including Intersecurity Holdings Corporation ("IXSV"); Universal Energy Corporation ("UVEC"); Rhino Outdoor International, later known as Xtreme Motorsports International ("RHOI" and "XTMS"); and Clean Coal Technologies, Inc. ("CCTI" or "CCTC"), which were sold to investors without disclosing the fact that the shares were restricted and leading the investors to believe that the shares were freely traded shares.

> The boiler room also sold shares of Green Energy Live ("GELV"), without ever obtaining those shares.

3

(Dkt. No. 1 at 4–5.)  The following excerpt from the indictment generally summarizes the tactics that Jones and others used to carry out the alleged scam:

> The defendants procured nearly worthless restricted shares of over-the-counter penny stock, and sold that stock at inflated prices to investors through the boiler room located in Spain.
>
> The defendants utilized a high pressure sales pitch made to investors containing false and fraudulent representations and omissions, including, among other things, not telling investors that the stock being sold was restricted stock; that the investors were directed to web sites which showed stock prices for freely traded stock, not the less valuable restricted stock actually provided; directing investors to look at fictitious and highly optimistic press releases which had been created for the boiler room in order to make the particular stock appear valuable.
>
> After investors purchased the stock, defendants directed the investors to send their payment, by international wire, to bank accounts in Canada, the United States and elsewhere.
>
> After receiving payments from the investors for the worthless stock, which in total amounted to more than $5,000,000, the defendants shared the profits from the conspiracy.

(*Id.* at 7–8.)

In addition to the general allegations quoted above, the Government alleged specific actions against Jones throughout all 40 counts of the indictment. According to the Government, the conspiracy to commit wire fraud among Jones and others began no later than February 3, 2006.  Jones helped register companies in Spain that ran the boiler room and maintained accounts at Spanish banks.  Jones also helped create fake websites and literature to give potential investors the illusion of legitimate financial operations in cities around the world.

4

According to the Government, Jones hired other codefendants in the case as callers who initiated contact with potential investors.  When other codefendants identified likely investors, Jones allegedly would act as a "closer" who would enter the conversation to conclude a deal.  Jones was one of the defendants in the case who played an important role in obtaining the restricted stock that would be sold as unrestricted.  When the scam acquired money from investors, Jones or another defendant would give instructions to other codefendants for wire transfers that would complete the transactions and that would enrich the operation and its participants.

In all, Jones faces the following charges.  In Count One of the indictment, the Government accuses Jones and others of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  In Counts Two through 30, the Government accuses Jones and others of specific instances of wire fraud (one transaction per count), each in violation of 18 U.S.C. §§ 1343 and 2.  In Count 31, the Government accuses Jones and others of conspiring to engage in money laundering in violation of 18 U.S.C. § 1956(h).  In Counts 32 through 34, the Government accuses Jones and others of three specific instances of money laundering in violation of 18 U.S.C. §§ 1957(a) and 2.  In Counts 35 through 40, the Government accuses Jones and others of six other specific instances of money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2.  The

indictment also includes three allegations for forfeiture of assets, including $5 million cash, allegedly connected to the scam operation.

### B. Jones's Detention and the Pending Motion

The circumstances leading up to Jones's detention will shape how the Court addresses the length of that detention.  As mentioned before, the Government filed the indictment on April 17, 2012, but the Court did not arraign Jones until almost a year later.  The Government needed time to find Jones in Barcelona, where he seems to have lived for approximately seven years before the arrest.  The parties dispute whether Jones moved from the United Kingdom to Spain for his own reasons or to flee prosecution in the UK for fraud.  Once arrested, Jones retained counsel; counsel in this case asserted at the bail review hearing that Jones challenged extradition on the advice of his attorney in Spain.

Jones finally arrived before this Court for arraignment and the detention hearing on March 4, 2013.  At the detention hearing, Jones did not contest the Government's motion for detention given his lack of status in the United States. The Court found Jones a flight risk by a preponderance of the evidence but ordered him detained without prejudice.

Jones filed the pending motion on June 30, 2015.  Jones seeks release based on the age of the case and his eagerness for an immediate trial.  Jones highlights that the case is well over three years old already, and yet none of the

10 active defendants[1] has filed pretrial motions yet.  The Government's discovery has spanned more than 1.5 million pages of documents, and various combinations of defense attorneys have asked for multiple extensions of time to review all the documents.  In fact, according to Jones, other defense counsel have suggested that the current motion deadline of October 29, 2015 (Dkt. No. 316) is unrealistic and that they will seek another extension by early fall.  The pace at which the case has proceeded the last several years aggravates Jones for two reasons.  First, Jones is one of only three defendants out of 10 in custody; the others have received various conditions of release, and at least one codefendant, Saad Shuaib, has been allowed to travel internationally to reunite with family.  Second, as early as the beginning of this year, Jones began objecting to exclusions of speedy-trial time and began requesting an immediate trial.  (*See* Dkt. Nos. 274, 316.)  Jones has argued more than once in court that he considers himself in a different position relative to the other defendants and that little of the voluminous discovery pertains to him.  Jones accordingly has decided to forgo the filing of pretrial motions.  In arguing for release, Jones expresses concern that his detention will continue with no end in sight, since the defendants who have been released have little incentive to move the case any faster than necessary.

---

[1] As of this writing, defendants David Cole and Kyle Clayton remain fugitives.

Although Jones has no ties to the United States, he has proposed a bail package to bolster his argument for release. Jones's parents in the United Kingdom apparently would be willing to house him and to post as much as $50,000 in bail. Jones has a brother in Australia who apparently is willing to post an additional $50,000 bail. Jones argues that $100,000 in bail would suffice to secure an overall bond of $250,000; he argues that he would not endanger family by skipping future court appearances.

The Government opposes Jones's motion for several reasons. As the indictment indicates, the Government considers Jones one of the principal architects of the entire scam operation, which allegedly defrauded over 250 victims of more than $5 million. The Government has proffered that it has numerous documents revealing communications from Jones to others directing the daily operations of the scam. The Government has proffered further that it has statements and sworn testimony from several victims detailing how they fell for the scam. As for flight risk, the Government makes several points. The Government highlights that Jones did not come to the United States voluntarily to answer charges; he forced the Government to commence extradition proceedings. Jones's situation differs from any other codefendants allowed to travel internationally, according to the Government, because the codefendants had much smaller roles in the scam while Jones directed it. Jones also allegedly has escaped charges at least once before. According to the Government, Jones

was arrested in London on February 22, 2012 when arriving there from Barcelona.  British authorities charged Jones with a nearly identical scam operation that targeted United Kingdom citizens.  British authorities released Jones on bail with an apparent restriction on travel outside the UK.  Jones allegedly ignored that travel restriction and returned to Spain to evade British authorities.  Finally, the Government contends that Jones has a history of using multiple aliases to evade responsibility for his scam operations.

The USPO recommends continued detention for substantially the same reasons that the Government has argued.  The USPO adds the additional point that it does not know the whereabouts of Jones's passport and does not know where Jones's residence in the United Kingdom would be, let alone how it would ever monitor him there.

## III.   DISCUSSION

### A. General Standard for Detention or Release

Since the Court's prior order of detention came without prejudice, it will not require Jones to meet the higher standard for reconsideration of a detention order.

"The Eighth Amendment to the Constitution states that '[e]xcessive bail shall not be required.'  U.S. Const. amend. VIII.  Consistent with this prohibition, 18 U.S.C. § 3142(b) requires a court to order the pre-trial release of a defendant on a personal recognizance bond 'unless the [court] determines that such

release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'" *U.S. v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).  Statutory factors to be considered when assessing flight or danger include the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  *See* 18 U.S.C. § 3142(g).  With respect to flight risk, "the government carries a dual burden in seeking pre-trial detention.  First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court."  *Sabhnani*, 493 F.3d at 75 (citations omitted).  "It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts."  *U.S. v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (citation omitted).  "In economic fraud cases, it is particularly important that the government proffer more than the fact of a serious economic crime that generated great sums of ill-gotten gains.  Merely having access to significant funds is not enough; evidence of strong foreign family or business ties is necessary to detain a defendant even in the face of a high monetary bond."

10

*U.S. v. Giordano*, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (citations omitted).

### B. Factors in Favor of Detention

Putting aside momentarily the length of Jones's detention, which the Court will address below, several factors weigh in favor of keeping Jones detained. Jones faces serious charges of orchestrating a multi-continental scam operation that defrauded over 250 victims of over $5 million. The Government has proffered extensive documentary and testimonial evidence of how Jones communicated with his codefendants regularly to execute the tactics pulled money from victims. *Cf. U.S. v. Jackson*, 823 F.2d 4, 7 (2d Cir.1987) ("As to the weight of the evidence, the government apparently has numerous informants as well as physical evidence to support its charges. Indeed, [defendant] has made no significant attack on the government's proffered evidence."). While Jones does not appear to have an extensive criminal history *per se*, he does appear to have a history of using aliases and ignoring travel restrictions to evade criminal responsibility. *Cf. U.S. v. Chimurenga*, 760 F.2d 400, 402 (2d Cir. 1985) (affirming a finding of risk of flight where the Government, *inter alia*, proffered the use of "bank accounts under various aliases"); *see also U.S. v. Stewart*, 19 F. App'x 46, 49 (4th Cir. 2001) (unpublished decision) ("Given Stewart's use of aliases in the past and his extensive knowledge of ways to evade the Government, it is not likely that any condition or combination of conditions would

reasonably assure his appearance.").  Jones also has no ties to the United States, let alone this District, and the whereabouts of his passport appear to be unknown.  The exact state of Jones's finances also is unknown.  *See Jackson*, 823 F.2d at 7 (including "hidden assets" as a factor weighing in favor of detention).  With these factors, the Government easily demonstrates by a preponderance of the evidence that Jones poses a risk of flight.

### C. Assessment of Due Process

The Court's inquiry, however, cannot end with the basic assessment of release factors under 18 U.S.C. § 3142(g), for the reason that defense counsel identified at the bail review hearing: "If we could see an end in sight—a light at the end of the tunnel—I wouldn't be here.  But there is no light at the end of the tunnel."  "The government may detain a defendant prior to trial consistent with the Due Process Clause of the Fifth Amendment so long as confinement does not amount to punishment of the detainee.  Absent an expressed intention to punish, whether detention constitutes impermissible punishment or permissible regulation turns on whether the government has a nonpunitive reason for detention and whether detention appears excessive in relation to the nonpunitive purpose.  Pretrial detention of a defendant, when of reasonable duration, serves important regulatory purposes, including the prevention of flight and the protection of the community from a potentially dangerous individual.  However, when detention becomes excessively prolonged, it may no longer be reasonable

12

in relation to the regulatory goals of detention, in which event a violation of due process occurs." *U.S. v. Millan*, 4 F.3d 1038, 1043 (2d Cir.1993) (internal quotation marks and citations omitted).  "To determine whether the length of pretrial detention has become constitutionally excessive, we must weigh three factors: (i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based, that is, the evidence concerning risk of flight and danger to the safety of any other person or the community." *Id.* at 1043 (internal quotation marks and citations omitted).  "There is no bright-line limit on the length of detention that applies in all circumstances; but for every set of circumstances, due process does impose some limit." *U.S. v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012).  The Court is particularly sensitive to allegations of excessive detention, given that the Second Circuit has a history of finding that "a cavalier attitude toward speedy trial rights was characteristic of the United States Attorney's Office in the Western District of New York." *U.S. v. Giambrone*, 920 F.2d 176, 182 (2d Cir. 1990).

> ### i.   Length of Detention

The first factor affecting a possible due-process violation is the total length of defendant's pretrial detention, regardless of any breakdown of responsibility that occurs later in the analysis.  *See U.S. v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir.1986) (beginning due-process analysis by "[f]ocusing first on the

duration of confinement" and acknowledging "the total time the defendants have been in pretrial detention").  Courts that measure total pretrial detention count actual detention plus likely prospective future detention; they ignore possible future detention that is only speculative.  *See id.* (assessing future scheduling that is "without speculation"); *see also Millan*, 4 F.3d at 1044 ("In weighing potential future detention, however, we take into account non-speculative aspects of future confinement.") (internal quotation marks and citations omitted). "While the length of pretrial detention is a factor in determining whether due process has been violated, the length of detention alone is not dispositive and will rarely by itself offend due process."  *U.S. v. El–Hage*, 213 F.3d 74, 79 (2d Cir.2000) (internal quotation marks and citations omitted).

Here, the length of Jones's detention weighs in his favor.  As of this writing, Jones has been in continuous custody in the United States for about 29 months; adding the year or so that Jones spent in custody in Spain during extradition proceedings, the total rises to about 41 months.  The Government is correct that Jones consented to some exclusions of speedy-trial time prior to 2015.  "That said, however, prior instances when the Second Circuit authorized detention extending beyond 30 months involved very high levels of dangerous criminal activity."  *U.S. v. Rodriguez*, No. 09-CR-331A, 2012 WL 6690197, at *11 (W.D.N.Y. Dec. 21, 2012) (Scott, *M.J.*).  Without downplaying the seriousness of the allegations against Jones, the Government has not accused him of anything

14

approaching bank robbery, racketeering, a continuing criminal enterprise, drug

crimes, or international terrorism.  *See id.* (reviewing prior Second Circuit cases).

Worse yet, the parties have not disputed that this case is nowhere near ready for

trial.  Over three years after the filing of the indictment and the first proceedings

in the case, no defendant has even come close to filing pretrial motions.  The

parties have not disputed that the most recent amended schedule, requiring

motions by October 29, 2015 and setting oral argument for December 21, 2015

(Dkt. No. 316), will prompt at least some defendants to seek further extensions

soon.  When pretrial motions eventually come, those motions almost certainly will

contain requests to suppress any number of materials from the 1.5 million pages

of documents that the Government has furnished in discovery.  If simply

preparing pretrial motions will wind up taking at least four years then an

additional two or three years to argue the motions, to hold hearings, and to issue

a Report and Recommendation is reasonable to predict, barring drastic

measures by this Court to accelerate the timetable over the objections of all

counsel.  If that predicted timetable holds then Jones would remain in U.S.

custody for almost five years before the parties were ready for trial.

       *ii.   Responsibility for Delay*

     Next, the Court will consider the extent to which the Government is

responsible for the years that defendant has spent in pretrial detention.  When

looking for "responsibility," courts will consider any conduct intended to cause

delay.  Courts also will charge to defendants time lost to motion practice that could have proceeded in a more efficient or practical way.  *Cf. Gonzales Claudio*, 806 F.2d at 341 ("[T]here is some basis for believing that defense counsel could have proceeded more expeditiously by taking a less fragmented approach to pretrial maneuvering.").  In between, though, lies a range of case-management decisions by the Government that warrant at least some of the respect afforded to prosecutorial discretion.  *See U.S. v. Orena*, 986 F.2d 628, 631 (2d Cir. 1993) ("[W]e decline to adopt a rule that would deter the government from seeking joint trials (or consenting to severance) as a means of economizing judicial and other resources.").  Courts generally avoid micromanaging cases, but respect for prosecutorial discretion does not mean that the Government always should receive complete absolution for decisions whose impact on pretrial detention is foreseeable.

Here, Jones has not pointed to any improper delay that the Government caused.  The only delay that the Government has created is the delay associated with producing 1.5 million pages of discovery.  *Cf. U.S. v. Liounis*, No. 12 CR 350 ILG, 2013 WL 5596014, at *2 (E.D.N.Y. Oct. 11, 2013) (denying a claim of a constitutional speedy-trial violation where "[t]he delay, in no small measure, is attributable also to the voluminous discovery required by the complex mail, wire and security frauds with which [defendant] is charged").  The Government produced discovery in batches and was forthright at all times about doing so.

16

When the Government had produced about 225,000 pages, Jones asked for

more time to review them.  (*See* Dkt. No. 84.)  Jones took the lead in seeking

"mega case" status, an implicit acknowledgment that preparing the case would

take time.  (*See* Dkt. No. 88.)  When the Court granted another extension for a

codefendant, it reminded all defendants explicitly that they fell under the same

speedy-trial clock absent a severance challenge.  (Dkt. No. 123.)  Jones did not

file for severance then.  When the Government reported on January 13, 2014

that it had just turned over more discovery, Jones did not protest the piecemeal

discovery and did not object to another extension of the pretrial schedule.  (*See*

Dkt. No. 171.)  After yet another extension for a codefendant, Jones did not

object or file for severance.  (*See* Dkt. No. 187.)  Jones instead joined the

request.  (*See* Dkt. No. 185.)  Jones also joined a request for an extension that a

codefendant filed on October 21, 2014.  (Dkt. No. 249.)  At a status conference

on October 31, 2014, the Court discussed with counsel whether the Government

owed further discovery.  (Dkt. No. 257.)  Jones again did not object to the pace of

discovery and did not request severance.  Meanwhile, Jones had been exploring

the possibility of a plea with the Government; those talks continued until around

November 19, 2014.  (Dkt. No. 260.)  Not until January 8, 2015 did Jones change

course and refuse to consent to further extensions of scheduling.  (*See* Dkt. No.

274.)  Even then, Jones expressed a desire for an immediate trial but did not file

for severance.  The first request for severance did not come until this pending motion.

What the above docket information suggests is that Jones spent almost the first two years of his time in the case consenting to extensions while exploring a possible plea, and then pivoting to a request for an immediate trial when the plead did not happen.  Jones has done nothing wrong by starting the case with one strategy and then switching to another.  His choice of strategy, though, means that any time that would need to run to force release or severance on speedy-trial grounds began to run only recently.  Hopefully the case proceeds over the next few months in a way that does not cross the threshold for a speedy-trial violation.  In any event, the Government at all times announced its intentions for production of discovery and bears no responsibility for the repeated schedule extensions that Jones sought or joined.  Absent an argument that piecemeal discovery is inherently dilatory and prejudicial, the second due-process factor weighs in favor of the Government.

### iii.  Strength of the Proof

As noted above and without infringing on the presumption of innocence, the final factor in the due-process analysis requires the Court to consider the strength of the Government's evidence that Jones poses a risk of flight.  The details of the Court's analysis appear earlier in this Decision and Order.  In short, Jones continues to face serious accusations that he helped orchestrate a

significant scam operation across two continents.  The Government has proffered detailed evidence of the tactics that Jones and his codefendants employed in furtherance of the scam.  Jones also has a history of prior offenses and use of aliases, and appears to have a history of evasion of foreign prosecution.  This information pushes the third due-process factor into the Government's column.

In the end, then, a review of the due-process factors shows one factor mildly in Jones's favor and two factors moderately to silently in the Government's favor.  In describing the factors that way, the Court does not mean to suggest that due-process analysis can be reduced to a mathematical formula.  The Court nonetheless concludes that Jones has not yet shown enough of a due-process violation to override the substantive factors that weigh in favor of detention.

The Court cautions the Government, however, that the argument for continued detention of Jones is on a slow collision course with Jones's due-process rights.  Between fugitives not yet apprehended, those fugitives likely wanting their own timeframe of a few years to review a large amount of discovery, and most if not all defendants likely asking for pretrial hearings eventually, Jones could wind up spending several more years in pretrial detention without Court intervention.  If that happens then the first due-process factor likely will overwhelm the other two as happened in *Rodriguez*.  The Court will deny Jones's motion today, but without prejudice to revisit, after March 1,

2016, how the various due-process factors discussed above have continued to develop.

As for Jones's alternative request for severance, this Court has a practice of deferring to the District Judge to avoid interfering with trial administration.  If Jones wants to appeal this Decision and Order to Judge Wolford for a ruling on severance then he is free to do so.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court denies Jones's motion (Dkt. No. 337), but without prejudice to revisit his detention status after March 1, 2016.

Jones will remain committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

Despite the Court's continued order of detention, and pursuant to 18 U.S.C. § 3142(i)(3), the Attorney General must afford Jones reasonable opportunity for private consultation with counsel. *See also U.S. v. Rodriguez* ("Rodriguez I"), No. 12-CR-83S, 2014 WL 4094561 (W.D.N.Y. Aug. 18, 2014) (Scott, *M.J.*).  Additionally, on order of the Court or on request of an attorney for the Government, the person in charge of the corrections facility in which Jones is confined must deliver Jones to a United States Marshal for the purpose of an appearance in connection with a court proceeding in this case. *See also U.S. v. Rodriguez* ("Rodriguez II"), No. 12-CR-83S, 2015 WL 1120157, at *7 (W.D.N.Y. Mar. 12, 2015) (Scott, *M.J.*) (interpreting 18 U.S.C. § 3142(i)(4) to allow transports to prepare for an oral argument or hearing).

In accordance with 18 U.S.C. § 3142(j), nothing in this Decision and Order will be construed as modifying or limiting the presumption of innocence.

SO ORDERED.

_/s/ Hugh B. Scott_

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 4, 2015